IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RYAN T.,[1]

                Plaintiff,

      v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

           Defendant.

Case No. 3:17-cv-02053-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

      Ryan T. ("Plaintiff") brings this appeal challenging the Commissioner of the Social

Security Administration's ("Commissioner") denial of his application for Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The Court

has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 1383(c)(3), which incorporates the

review provisions of 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party or parties in this case. Where applicable, this opinion uses
the same designation for a non-governmental party's immediate family member.

Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

## BACKGROUND

Plaintiff was born in April 1988, making him twenty-five years old on March 28, 2014, the day he filed his protective application.[2] (Tr. 23.) Plaintiff has a limited education and past relevant work experience as a lubrication servicer. (Tr. 22-23.) In his application for SSI, Plaintiff alleges disability due to diabetes, gastroparesis, neuropathy, and Cushing's disease.[3] (Tr. 58, 70.)

On August 13, 2014, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 64-65.) Dr. Kehrli concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours during an eight-hour workday; and push and pull in accordance with his lifting and carrying restrictions. Dr. Kehrli also concluded that Plaintiff does not suffer from postural, manipulative, visual, or communicative limitations, but Plaintiff does need to avoid even moderate exposure to hazards, such as machinery and heights (environmental limitation).

---

[2] The relevant time period here is March 28, 2014, the date Plaintiff filed his protective application, to April 26, 2017, the date of the ALJ's decision, because SSI is not retroactive. *See Koster v. Comm'r Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is September 24, 2010, the date Koster filed his protective application, to August 15, 2012, the date of the ALJ's decision." (citing 20 C.F.R. § 416.335)).

[3] "Cushing's disease is a condition in which the pituitary gland releases too much adrenocorticotropic hormone (ACTH)." *Brindle v. Astrue*, No. 11-176, 2012 WL 292808, at *7 n.22 (M.D. Pa. Jan. 31, 2012) (citation omitted).

On August 15, 2014, Dr. Sandra Lundblad ("Dr. Lundblad"), a non-examining state agency psychologist, completed a psychiatric review technique form. (Tr. 62-63.) Dr. Lundblad determined that Plaintiff's mental impairments failed to meet or equal listing 12.09 (substance addiction disorders).

On January 1, 2015, Dr. Leslie Arnold ("Dr. Arnold"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 77-78.) Dr. Arnold reviewed Plaintiff's medical records and agreed with Dr. Kehrli's assessment in all relevant respects.

On January 12, 2017, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 32-57.) Plaintiff testified that he was pulled out of school in the ninth grade because he was "too sick" and needed to undergo multiple surgeries to remove cancerous tumors from his pituitary gland; he last worked full-time at Jiffy Lube in 2006 and 2007; he quit working at Jiffy Lube and moved back to Oregon to "live with [his] mom again" because he "started getting weaker and . . . started having more and more health complications with low energy levels"; and he suffers from seizures. (Tr. 36-39.) In addition, Plaintiff testified that he was diagnosed with gastroparesis and received a gastric stimulator, which has "kind of helped"; he has a history of methamphetamine and marijuana use; he used marijuana for pain and to help increase his appetite when he was sick; he previously sold methamphetamine because his father, who is incarcerated, "was dealing at th[e] time and . . . it was the only way for [Plaintiff] to make money"; he tested positive for methamphetamines on October 28, 2015, but he has "abstained from all mood and mind altering . . . drugs since"; he does not drink alcohol; he completed a "really intense" drug rehabilitation program "when [he] was incarcerated"; he was released from custody on December 7, 2016; he attends Narcotics

Anonymous ("NA") meetings twice a week; he would like to earn his General Equivalency Diploma and work on cars; and he continues to suffer from gastroparesis symptoms, such as nausea, vomiting, and diarrhea, despite having his gastric stimulator fixed in August 2013. (Tr. 39-45.)

The ALJ posed several hypothetical questions to a Vocational Expert ("VE") who testified at Plaintiff's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform light work that: (1) involves frequently balancing and pedaling "with both lower extremities"; and (2) does not involve climbing ladders, ropes, and scaffolds, or exposure to hazards. (Tr. 54.) The VE testified that the hypothetical worker could not perform Plaintiff's past relevant work as a lubrication servicer, but the hypothetical worker could be employed as a cashier II, office helper, and product assembler. (Tr. 53-54.)

Second, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform sedentary work that: (1) involves frequently balancing, crawling, and pedaling "with both lower extremities"; and (2) does not involve climbing ladders, ropes, and scaffolds, or exposure to hazards. (Tr. 55.) The VE testified that the hypothetical worker could not perform Plaintiff's past relevant work as a lubrication servicer, but the hypothetical worker could be employed as a document preparer, assembler, and order clerk. (Tr. 55.) Responding to the ALJ's third and final hypothetical, the VE confirmed that the hypothetical worker could not sustain gainful employment if he was "absent from work more than two days per month due to the side effects of medication and other required treatment." (Tr. 56.)

On March 20, 2017, the ALJ referred Plaintiff to Dr. Raymond Nolan ("Dr. Nolan") for a

consultative examination. (Tr. 2891-93.) Dr. Nolan determined that Plaintiff suffers from "type I

diabetes mellitus with [a] history of diabetic retinopathy, . . . diabetic peripheral neuropathy, and

autonomic neuropathy including gastroparesis and resting tachycardia"; chronic "low back pain

syndrome"; chronic "shoulder pain with modest restriction of [his] right shoulder range of

motion"; and a history of Cushing's disease, which "might have [only] been an issue prior to the

resection of [Plaintiff's] pituitary." (Tr. 2892.) With respect to functional capabilities, Dr. Nolan

stated:

> [T]his man would want to restrict bending, twisting and turning of
> the trunk. Lifting and carrying should be limited to 10 pounds on a
> frequent basis and up to 20 pounds on occasion. Pushing and
> pulling activity involving his upper extremity should be limited to
> occasional basis, particularly on the right side and use of [the] right
> arm extended overhead should be limited to the low end of
> occasional basis. Because there is [a] substantial question as to
> [Plaintiff's] level of diabetic control, he would not want to be
> working in unprotected heights or around moving equipment. . . .
> He should be able to sit for at least six hours in an eight-hour day
> with a liberal policy for position change if needed for comfort. He
> should be able to stand and/or walk for up to four hours in an
> eight-hour day. Appropriate breaks as needed for comfort. . . . The
> recurring episodes of nausea and vomiting associated with that
> gastroparesis can be problematic in terms of reliability of showing
> up for work.

(Tr. 2892; *see also* Tr. 2894-99, setting forth Dr. Nolan's medical source statement dated March

20, 2017).

In a written decision issued on April 26, 2017, the ALJ applied the five-step evaluation

process set forth in 20 C.F.R. § 416.920(a)(4), and determined that Plaintiff was not disabled.

*See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for

review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed

to federal court.

## THE FIVE-STEP DISABILITY ANALYSIS

## I.     LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof at the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

///

///

## II.     THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 13-24.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 28, 2014, the day he filed his protective application. (Tr. 15.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "[D]iabetes mellitus, type I; diabetic ketoacidosis (DKA); diabetic neuropathy; a history of diabetic gastroparesis, status post-gastric pacemaker implantation; Cushing's disease; and headaches." (Tr. 15.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 17.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to the following limitations: (1) Plaintiff "can frequently balance" and "frequently pedal with his bilateral lower extremities"; (2) Plaintiff "can never climb ladders, ropes, or scaffolds"; and (3) Plaintiff "can tolerate no exposure to workplace hazards, such as machinery and unprotected heights." (Tr. 18.) At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a lubrication servicer. (Tr. 22.) At step five, the ALJ concluded that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform, including work as a cashier II, "[a]ssembler, production," and office helper. (Tr. 23-24.)

## ANALYSIS

## I.     STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of

evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## II.     DISCUSSION

In this appeal, Plaintiff argues that the ALJ: (1) made a de facto reopening of Plaintiff's previously denied application for SSI, or, alternatively, that the ALJ erred by failing to address Plaintiff's request to reopen his previously denied application; (2) failed to provide clear and convincing reasons for discounting Plaintiff's symptom testimony; (3) failed to provide germane reasons for rejecting the lay witness testimony provided by Plaintiff's mother, Dennette T.; (4) failed to provide legally sufficient reasons for discounting the opinion of Plaintiff's examining physician, Dr. Nolan; and (5) failed to account for all of Plaintiff's credible limitations in formulating his RFC. As explained below, the Commissioner's decision is free of harmful legal error and supported by substantial evidence. Accordingly, the Court affirms the Commissioner's decision.

///

///

## A.        The Commissioner's Prior Decision

Generally, "the Commissioner's refusal to reopen a prior decision is not subject to judicial review." *Adams v. Colvin*, No. 12-829-HU, 2013 WL 4859308, at *22 (D. Or. Sept. 11, 2013) (citing *Klemm v. Astrue*, 543 F.3d 1139, 1144 (9th Cir. 2008)). "[A]n exception to this general rule exists 'where the Commissioner considers 'on the merits' the issue of the claimant's disability during the already-adjudicated period.'" *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 827 n.3 (9th Cir. 1995)).

In *Adams*, for example, the plaintiff argued that the ALJ erred by failing to adjudicate his prior SSI application because the plaintiff requested that the application be reopened and the ALJ indicated that he would consider the request, stating: "And I note you have in writing requested that a previous application be re-opened so I will include that in my decision-making process." *Adams*, 2013 WL 4859308, at *22. The ALJ, however, did not provide an explicit "refusal to reopen" before denying the plaintiff's SSI application. *Id.* The *Adams* court stated that, although the ALJ "did not expressly so state, the ALJ denied [the plaintiff's] request to review the prior denial." *Id.* at *23. The *Adams* court emphasized "the time period encompassed by the ALJ's ruling," noting that "[r]ather than ruling on whether [the plaintiff] was disabled from his alleged disability onset date of March 31, 2007, which would have included the already-adjudicated period, the ALJ limited his ruling to the period from the date of [his] current [SSI] application, March 12, 2008."[4] *Id.* Accordingly, the *Adams* court held that the ALJ did not "consider on the merits" the issue of the plaintiff's disability during the already-adjudicated period and that the denial of the plaintiff's request to reopen was not subject to judicial review. *Id.*

---

[4] "[T]he earliest an SSI claimant can obtain benefits is the month after which he filed his application[.]" *Schiller v. Colvin*, No. 12-771-AA, 2013 WL 3874044, at *1 n.1 (D. Or. July 23, 2013) (citation omitted).

Similarly, in *Reyes v. Comm'r of Soc. Sec.*, No. 10-4571, 2012 WL 1094337, at *3 (N.D. Cal. Mar. 29, 2012), the plaintiff filed her first application on February 25, 2005, alleging a disability onset date of May 30, 2002, and filed her second application on October 30, 2008, alleging a disability onset date of June 14, 2005. *Id.* The plaintiff argued that "the ALJ de facto reopened her earlier application when he considered medical evidence that dated back to 2002." *Id.* The *Reyes* court noted that several circuits have held that the consideration of pre-onset date evidence, "on its own, is insufficient to cause a de facto reopening of a decision." *Id.* at *5. The *Reyes* court also distinguished the Ninth Circuit's decision in *Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001), on the ground that "the ALJ did not 'accept without comment' an onset date earlier than June 14, 2005." *Reyes*, 2012 WL 1094337, at *6. Rather, the ALJ indicated that he "intended to treat June 14, 2005 as the alleged onset date." *Id.* The *Reyes* court added that the ALJ "appear[ed] to have reviewed the medical evidence prior to June 14, 2005 as cumulative medical history and not to have considered [the plaintiff's] earlier application on the merits." *Id.* Accordingly, the *Reyes* court held that the ALJ "did not de facto or constructively reopen [the plaintiff's] first application." *Id.*

In this case, Plaintiff's counsel asked the ALJ at the hearing to "consider reopening" Plaintiff's August 30, 2011 SSI application, which was denied on November 22, 2011, and not appealed to federal court. (Tr. 47-48, 56-57, 59.) The ALJ stated that she would "consider that request." (Tr. 57.) In her decision, the ALJ did not explicitly state that she was denying Plaintiff's request to reopen his prior application. The ALJ observed that Plaintiff was "alleging disability beginning January 15, 2007," and considered evidence that predated Plaintiff's protective filing date of March 28, 2014. (*See* Tr. 13, 19, noting the alleged onset date; Tr. 20, citing Tr. 1735, which is a 2007 treatment note referring to the fact that Plaintiff "continues to

have a haphazard approach to insulin therapy"). As in *Adams*, however, the ALJ's decision makes clear that she limited her ruling to the period from the date of Plaintiff's current SSI application, March 28, 2014, thereby denying Plaintiff's request to reopen his SSI application filed on August 30, 2011. (*See* Tr. 13, explaining that the ALJ considered the complete medical history in accordance with Social Security regulations, even though SSI "is not payable prior to the month following the month in which the application was filed," and concluding that "all the evidence" indicated that Plaintiff "has not been under a disability . . . since March 28, 2014, the date the application was filed"; Tr. 24, determining that Plaintiff "has not been under a disability, as defined in the Social Security Act, since March 28, 2014, the date the application was filed"; *see also* Tr. 15, assessing whether Plaintiff engaged in substantial gainful activity "since March 28, 2014, the application date").

Consistent with the *Adams* decision, the Court concludes that the ALJ did not consider on the merits the issue of Plaintiff's disability during the already-adjudicated period and that the ALJ's denial of Plaintiff's request to reopen is not subject to judicial review. *See Reed-Goss v. Astrue*, 247 F. App'x 923, 924 (9th Cir. 2007) ("[T]he Commissioner's decision not to reopen is non-reviewable. 'Generally, courts do not have jurisdiction to review the Secretary's decision not to reopen a previously adjudicated claim.' An exception exists, however, 'where the Secretary's denial of a petition to reopen is challenged on constitutional grounds.'") (citation omitted); *see also Columbel v. Comm'r of Soc. Sec.*, No. 16-773, 2017 WL 3175599, at *18 (N.D.N.Y. July 26, 2017) ("[T]he ALJ explicitly indicates in the written decision that she found Plaintiff 'was not under a disability within the meaning of the Social Security Act from March 21, 2000, through the date last insured.' . . . Since Plaintiff reported that his previous applications were denied on March 20, 2000, the ALJ's decision indicates that she did not intend her findings to

apply for any time period covered by the previous applications. . . . Therefore, this Court does not have the ability to review the ALJ's decision not to reopen Plaintiff's prior applications [under] the first exception [i.e., where the Commissioner has constructively reopened the application] to the lack of jurisdiction.").[5]

Citing the Ninth Circuit's decision in *Lewis*, Plaintiff argues that it is appropriate to treat the ALJ's actions as a de facto reopening of Plaintiff's prior application because the ALJ considered evidence from the already-adjudicated period and the ALJ accepted Plaintiff's alleged onset date "without comment." (Pl.'s Opening Br. at 3; Pl.'s Reply Br. at 1.) The Court is not persuaded by Plaintiff's argument. Ninth Circuit cases "have declined to find de facto reopening based solely on the ALJ's review of evidence relevant to a prior adjudication, or on the review of medical history from the prior application period." *Rita L. S. v. Comm'r of Soc. Sec.*, No. 16-01981-MC, 2018 WL 4361039, at *3 (D. Or. Sept. 13, 2018) (citations omitted). Furthermore, the ALJ did not accept Plaintiff's alleged onset date without comment. Rather, the ALJ did what ALJs commonly do when analyzing an SSI application: refer to the claimant's alleged onset date but assess only whether the claimant was disabled between the protective filing date and the date of the ALJ's decision, because the earliest the claimant can obtain benefits is the month after which he filed his protective application.

In sum, the ALJ did not de facto reopen Plaintiff's prior application and the ALJ's denial of Plaintiff's request to reopen is not subject to judicial review.

///

///

///

---

[5] The Court notes that Plaintiff has not presented a constitutional challenge here.

## B.    Plaintiff's Symptom Testimony

### 1.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### 2.    Application of Law to Fact

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably

produce the pain or symptoms alleged. (*See* Tr. 19, finding that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms"). Accordingly, the ALJ was required to provide clear and convincing reasons for discrediting Plaintiff's testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ met that standard here.

### a.        Drug-Seeking Behavior

First, the ALJ discounted Plaintiff's testimony based on his history of drug-seeking behavior. (*See* Tr. 20, stating that Plaintiff was "noted to exhibit drug-seeking behavior, which undermines his allegations regarding the intensity, persistency, and limiting effects of his abdominal pain"; *see also* Tr. 16, citing additional examples of drug-seeking behavior). This was a clear and convincing reason for discounting Plaintiff's symptom testimony. *See Hanson v. Colvin*, 15-1974-JE, 2017 WL 2432159, at *9 (D. Or. May 2, 2017) (holding that the plaintiff's drug-seeking behavior was a clear and convincing reason to discount the plaintiff's symptom testimony); *Orcutt v. Barnhart*, No. 04-00889, 2005 WL 2387702, at *7 (C.D. Cal. Sept. 27, 2005) (holding that the ALJ provided clear and convincing reasons for discounting the plaintiff's testimony and noting that the ALJ relied on the plaintiff's "drug-seeking history of illegal substances").

Plaintiff argues that the ALJ's reliance on drug-seeking behavior was misplaced because: (1) none of Plaintiff's "physicians suggest he was exaggerating his symptoms in order to obtain illicit drugs"; and (2) "[i]n the five years subsequent to April 2012, there are no other assessments of drug-seeking behavior, despite [Plaintiff's] chart being flagged so that his physicians would stay alert for this." (Pl.'s Opening Br. at 15.) The Court is not persuaded by Plaintiff's arguments.

In the Court's view, even if no physician explicitly stated that Plaintiff exaggerated his symptoms to obtain illicit drugs, the physicians' references to drug-seeking behavior and refusal to prescribe opiates reasonably implies that the physicians believed Plaintiff was seeking opiates for an improper purpose. Thus, it was reasonable for the ALJ to discount Plaintiff's testimony based on his drug-seeking behavior. (*See also* Tr. 1214, "[The patient] has frequent episodes of presenting to the [emergency department] with similar complaints, demanding opiates. Both his [primary care provider] and the [emergency department] have decided to not prescribe opiates for this patient, as opiates will only serve to worsen his gastroparesis. In addition, he has a history of drug use in the past, including methamphetamines, marijuana, and positive [urine drug screen] for Methadone (which his mother states she bought for him on the street). Upon learning about the patient's substance issues, the patient's opiate medications were stopped, and the reasoning was discussed with the patient. He became extremely angry, yelling and swearing at the medical team, and demanding the medications. The risks opiates and their effect on gastroparesis was explained, but the patient did not appear to be satisfied with this explanation."; Tr. 1277, "According to [emergency department] staff, patient and mother are very unhappy as they were told that patient will not receive opiates as they will worsen his symptoms. The patient . . . told me that he wanted to punch the [emergency department] physician."; Tr. 1828-29, noting that Plaintiff only filled his oxycodone prescription, Plaintiff did not fill his prescription for a nausea medication, and the treating provider was "dismayed by his actions").

With respect to Plaintiff's argument that there has been no documented drug-seeking behavior since April 2012 (i.e., when Plaintiff's providers stopped prescribing opiates), the record evidence indicates that Plaintiff continued to use opiates, marijuana, methamphetamine, and heroin after April 2012. (*See* Tr. 422, noting on January 19, 2014, that Plaintiff's "[d]rug

use" consisted of "[m]arijuana" and "[o]piates"; Tr. 2591, noting on February 9, 2016, that

Plaintiff "says he sold heroin" and "[t]he last time he used was Christmas time 2015"; *see also*

Tr. 15, noting that Plaintiff testified that he was "dealing drugs" post-onset date; Tr. 40, noting

that Plaintiff testified that he tested positive for methamphetamine on October 28, 2015;

Tr. 1281, noting that Plaintiff's "[t]endency to seek illegal opiates [is] concerning" and there was

"concern for opiate abuse"; Tr. 1381, noting that there are "[n]umerous opiate flags"). Although

his physicians did not continue to document drug-seeking behaviors once the pattern was flagged

in his files, Plaintiff continued to abuse polysubstances during the time period. Accordingly, the

ALJ reasonably determined that Plaintiff's testimony was undermined by evidence that he

engaged in drug-seeking behavior. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)

("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

conclusion that must be upheld."); *see also Gonzales v. Colvin*, No. 12-00372, 2013 WL

2445210, at *4 (C.D. Cal. June 5, 2013) ("[I]n view of plaintiff's history of polysubstance abuse,

his drug-seeking behavior supports the ALJ's finding that plaintiff's description of his pain and

symptoms was not wholly credible.").

### b.     Reported Activities

The ALJ also discounted Plaintiff's testimony based on his reported activities. (Tr. 21.)

For example, the ALJ noted that, despite alleging that he is "disabled and unable to work,"

Plaintiff "admitted to some ongoing work activity after his alleged onset date (hearing

testimony)." (Tr. 21; *see also* Tr. 15, 19, noting that Plaintiff "testified that he continued to work

after his alleged onset date, including dealing drugs and cleaning bathrooms (hearing

testimony)"). The ALJ also noted that Plaintiff reported that he "maintains his personal care,

prepares meals, performs household chores, walks, bikes, exercises regularly, shops, manages his

finances, hunts, and fishes," and that "he spends time socializing with his friends and significant

other." (Tr. 21.) In addition, the ALJ noted that, despite alleging that he was unable to work due in large part to his lack of energy, Plaintiff "engaged in and completed alcohol and drug treatment, including attending classes and other related programs for 14 hours of the day—far in excess of the 8-hour day required of competitive employment." (Tr. 19-20.) Overall, the ALJ determined that Plaintiff's reported activities undermined his allegations of disabling symptoms. (Tr. 20, 21.)

It is well settled that an ALJ may discount a claimant's testimony based on activities that are incompatible with the claimant's testimony regarding the severity of his symptoms. *See Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014) ("Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination."); *Ghanim*, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."). Even where the claimant's "activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citation omitted).

Plaintiff argues that the ALJ's reliance on his reported activities was misplaced because his work activity, including his work as a drug dealer, "is not inconsistent with testimony that . . . he would be absent more than one or two days per month" as result of his conditions. (Pl.'s Opening Br. at 8.) The ALJ, however, determined that Plaintiff's work as a drug dealer was inconsistent with his testimony that "he was unable to work due to lack of energy." (*See* Tr. 19, noting that Plaintiff alleged that he was unable to work "due to lack of energy" and that Plaintiff admitted that he worked "as a drug dealer" despite his "alleged limitations"). In the

Court's view, it was reasonable for the ALJ to conclude that Plaintiff's ability to work as a drug dealer was inconsistent with his testimony regarding debilitating energy levels. (*Compare* Tr. 43, noting that Plaintiff testified that he stopped working at Jiffy Lube around the alleged onset date based in large part on his poor "energy level," which impaired his ability to "get up in the morning" and "be on [his] feet more than 40 minutes to an hour at a time," *and* Tr. 47, noting that Plaintiff testified that he could not perform a "[s]it-down job" because of his "energy level" and the fact that "doing anything . . . just tires [him] out," *with* Tr. 40, indicating that Plaintiff testified that he decided to sell drugs because he did not have a source of income after he stopped working).

Plaintiff also argues that the ALJ erred in relying on his participation in a drug treatment program because the program "is not commensurate with full-time work," Plaintiff's participation "does not mean he could sustain work activity for a full 40-hour week," and Plaintiff testified that there were days when he was absent from the program. (Pl.'s Opening Br. at 8.) Plaintiff did testify that there were "a couple days" where he "wasn't feeling it" and "couldn't do" the drug treatment program. (Tr. 50.) Plaintiff, however, also testified that he "completed" the program, that the program was "really intense," and that he was "engaged in treatment work" for "14 hours out of the day." (Tr. 41, 50.) Given this testimony, it was reasonable for the ALJ to conclude that Plaintiff's ability reliably to participate in roughly 14 hours of daily treatment was inconsistent with his testimony regarding debilitating energy levels. (*See* Tr. 19-20, suggesting that Plaintiff's participation was inconsistent with his allegation that he "lacked the energy to work"; *see also* Tr. 47, indicating that Plaintiff testified that he could not even perform a "[s]it-down job" because of his "energy level" and the fact that "doing anything . . . just tires [him] out").

Finally, Plaintiff argues that the ALJ erred by mischaracterizing the activities described in his function report. (Pl.'s Opening Br. at 8.) Specifically, Plaintiff notes that the ALJ relied on his ability to hunt and fish, even though Plaintiff identified hunting and fishing as past hobbies. (Pl.'s Opening Br. at 9.) Plaintiff also notes that he reported that he is unable to socialize because he is "weak and just do[es]n't have the energy to do so," and that he shops every few weeks for an hour to an hour-and-a-half, but he also "get[s] tired" and needs "help." (Pl.'s Opening Br. at 9.)

The Court agrees that the ALJ erred in relying on Plaintiff's ability to hunt and fish because Plaintiff reported that his "hobbies *were* hunting [and] fishing" and that he is "unable to hunt as [he] use[d] to." (Tr. 217 (emphasis added); *see also* Tr. 2862, stating on March 31, 2015, that Plaintiff's "homework" consisted of, among other things, "fishing – (pursuing buddies license, looking over gear, etc.)"). The Court, however, concludes that this error was harmless given the other reported activities that the ALJ cited as incompatible with the severity of symptoms alleged. (*See* Tr. 215, 217, indicating that Plaintiff testified that he has no problems with getting dressed, bathing, caring for his hair, shaving, feeding himself, and using the toilet; he prepares meals on a daily basis and spends between twenty minutes and two hours doing so; he tries "to get out every day" to walk; and he "hangs out with [his] girlfriend" two to three "time[s] [per] week"; Tr. 2514, stating on July 21, 2014, that Plaintiff had "been conducting exercises several times a day"; Tr. 2589-91, noting in 2016 that Plaintiff was "get[ting] exercise daily" and "walking a lot of laps outdoors," and he reported his "energy is normal" and he "had been exercising until he hurt his shoulder" during a recent fight; Tr. 2751, stating on November 29, 2014, that Plaintiff reported that he "hurt [his] hand trying to put [his] bike in [a] truck"; Tr. 2768, observing on June 23, 2015, that Plaintiff reported that "he was outside with his friends

most of the day and into the evening last night riding his bike in the heat and fe[lt] like maybe he didn't drink enough fluids"; Tr. 2856, noting on March 5, 2013, that Plaintiff reported his physical activity consisted of "walking and biking, at least [once] daily, 15-20 min[utes], most days"; *see also* Tr. 21, indicating that the ALJ cited the foregoing record evidence in her decision).

### c. Treatment Noncompliance

The ALJ also discounted Plaintiff's testimony because he failed to follow treatment recommendations. (*See* Tr. 21, stating that Plaintiff "has a history of noncompliance with his diabetes medication and treatment recommendations," Plaintiff has "refused" his providers' offers for "ongoing diabetes education," and Plaintiff's "failure to follow through with treatment and doctor recommendations suggest his symptoms may not have been as serious as alleged"; Tr. 20, noting that Plaintiff has a "history of non-adherence to medical recommendations"). Failure to comply with treatment recommendations is a clear and convincing reason for discounting a claimant's symptom testimony. *Martin v. Berryhill*, 722 F. App'x 647, 650 (9th Cir. 2018).

Plaintiff argues that substantial evidence does not support the ALJ's finding that he failed to follow treatment recommendations. In the Court's view, however, substantial evidence (i.e., more than a mere scintilla but less than a preponderance) supports the ALJ's finding that Plaintiff has a history of noncompliance with his diabetes medication and treatment recommendations. (*See* Tr. 1705, noting that Plaintiff reported having "more energy" when he complied with the recommendation to take a prescribed medication; Tr. 1735, stating that Plaintiff's diabetes was under "poor control" and he "continue[d] to have a haphazard approach to insulin therapy"; Tr. 1737, "He is clearly not taking enough insulin and needs to start taking bolus insulin with all meals"; Tr. 1815, "He also abuses methamphetamine, and he abuses insulin

too and [it] makes his care very difficult"; Tr. 2615, noting on June 24, 2015, that Plaintiff's diabetes is poorly controlled and he has a history of "insulin noncompliance"; Tr. 1427, "[T]here is a suggestion that his [diabetes] is under poor control [and] that would contribute to his gastroparesis. He is also taking street drugs (methadone and has a [history of] methamphetamine) which is likely exacerbating his gastroparesis"; Tr. 1828-29, stating that Plaintiff only filled his oxycodone prescription and did not fill his prescription for a nausea medication, and his provider was "dismayed by his actions"; Tr. 1922, "I suspect a lot of his symptoms may be related to substance abuse"; Tr. 1925, noting that Plaintiff has been hospitalized for diabetic ketoacidosis ("DKA") and that his diabetes "has never been well controlled," but adding that his "control is probably complicated by noncompliance, substance abuse, etc."; Tr. 2864, noting on August 14, 2015, that a treating provider discussed Plaintiff's "[m]ethamphetamine use and [its] association with his hospitalizations"; Tr. 2867, stating on September 8, 2015, that Plaintiff's diabetes is uncontrolled and "[m]uch of this is related to noncompliance"; Tr. 2904, noting on May 23, 2017, that Plaintiff has a history of "medication noncompliance per OHSU endo[crinology] clinic"; Tr. 2984, observing that on May 26, 2017, that Plaintiff was "admitted for nausea, vomiting, gastroparesis and DKA with some component of noncompliance").

In sum, although Plaintiff offers a rational, alternative interpretation of the record, the Court concludes that the ALJ's interpretation of the record was also rational and, therefore, must be upheld. *See Crawford v. Berryhill*, 745 F. App'x 751, 753 (9th Cir. 2018) (rejecting objections to the ALJ's findings because they "amount[ed] to advocating for alternatives to the ALJ's rational interpretation of the record and therefore d[id] not demonstrate error"); *Wilcox ex rel. Wilcox v. Colvin*, No. 13-2201-SI, 2014 WL 6650181, at *5 (D. Or. Nov. 24, 2014)

("Plaintiff's alternative interpretation of the evidence is insufficient to overturn the ALJ's findings.").

### d. Conclusion

The Court must uphold the ALJ's decision to discount Plaintiff's testimony because the ALJ provided at least two clear and convincing reasons for doing so. *See Anderson v. Colvin*, 223 F. Supp. 3d 1108, 1129 (D. Or. 2016) ("[T]he ALJ provided two clear and convincing reasons for finding Plaintiff's symptom testimony not supported by the record. Accordingly, the Court must uphold the ALJ's determination."); *Mones v. Comm'r Soc. Sec. Admin.*, No. 14-917-CL, 2015 WL 4645448, at *7 (D. Or. July 1, 2015) (finding that the ALJ erred in discounting the claimant's symptom testimony based on her activities and conflicting medical evidence but holding that any error was harmless because the ALJ did "provide[ ] two clear and convincing reasons").

### C. Lay Witness Testimony

#### 1. Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing reasons that are germane to each witness. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10-1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Furthermore, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony

is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

## 2. Application of Law to Fact

Plaintiff argues that the ALJ failed to germane reasons for discounting his mother's (Lennette T.) testimony. In a letter dated January 16, 2017, Lennette T. made the following statements about Plaintiff:

> I am very happy to have [Plaintiff] home. [He] was incarcerated for [about] 1[2] months [and] released 12/7/2016. Today and every day s[i]nce [he] has been home I see a young man that is determined to live life. [He] is taking care of himself. [He is] [t]aking his insulin[] and med[ications]. [He] is having a few medical issues due to the diabetes. [He] can't really feel [his] feet and lower legs [due to] numbness. [He] [h]as had a few low blood sugars out of [the last] 28-30. He tires quickly when doing things. He has some days that he has no energy.

(Tr. 256; *see also* Pl.'s Opening Br. at 13, stating that Plaintiff was incarcerated in December 2015).

The ALJ assigned Lennette T.'s statements only "partial weight" because they: (1) were "not entirely consistent with the record as a whole, including [Plaintiff's] medical records and activities of daily living"; and (2) "were not indicative of an inability to sustain work activity." (Tr. 19.)

Plaintiff argues that the ALJ erred by failing to "identify any inconsistencies" between Lennette T.'s statements and the record. (Pl.'s Opening Br. at 18.) The Court concludes that the ALJ's findings were sufficiently specific because the ALJ cited Plaintiff's activities, which, as discussed above, the ALJ described in detail in her decision and supported discounting Plaintiff's testimony. Plaintiff also argues that tiring quickly and occasionally lacking energy are indicative of an inability to sustain work activity, contrary to the ALJ's finding. (Pl.'s Opening Br. at 18.)

From the Court's perspective, Lennette T.'s statements do not necessarily reflect an inability to sustain work activity. Accordingly, the ALJ provided germane reasons for discounting Lennette T.'s statements.

Even assuming that the ALJ failed to provide germane reasons for discounting Lennette T.'s statements, the Court concludes that any error was harmless because Lennette T.'s statements provided essentially the same information as Plaintiff's statements, which the ALJ permissibly discounted. *See Woodmass v. Berryhill*, 707 F. App'x 432, 436 (9th Cir. 2017) (stating that the ALJ did not provide germane reasons for discounting the lay witness's statements and holding that the error was harmless because her "statements provided essentially the same information as [the claimant's] statements, which the ALJ permissibly discounted") (citation omitted).

**D. Medical Opinion Evidence**

**1. Applicable Law**

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). "Where a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick v. Chater*, 157 F.3d

715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id*. at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

## 2.    Application of Law to Fact

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for discounting Dr. Nolan's opinion. (Pl.'s Opening Br. at 3, 5-6.) Dr. Nolan's opinion conflicts with the opinions of the non-examining state agency physicians, none of whom opined, for example, that Plaintiff can only stand and/or walk for four hours in an eight-hour workday. (*Compare* Tr. 64, *and* Tr. 74, *with* Tr. 2895.) Therefore, the ALJ needed to provide specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Nolan's opinion. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'") (citation omitted); *Kilian v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Kilian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ met that standard here.

First, the ALJ discounted Dr. Nolan's opinion based on his reliance on Plaintiff's unreliable self-reports, which is a specific and legitimate reason for discounting a physician's opinion. *See Blansette v. Berryhill*, 721 F. App'x 715, 716 (9th Cir. 2018) (holding that the ALJ

provided specific reasons for discounting a physician's opinion and noting that the ALJ rejected the physician's opinion based on the physician's "reliance on [the claimant's] unreliable self-reports"). Specifically, the ALJ noted that many of Dr. Nolan's limitations were based on Plaintiff's reports of a stroke and back and shoulder pain. He also referred to a diagnosis of diabetic retinopathy. As the ALJ explained, however, there is no "objective evidence of a stroke," Plaintiff has not been diagnosed with a stroke, there is "no diagnosis of an underlying cause or impairment related to . . . back or shoulder pain," and "despite [Plaintiff's] subjective reports, there is no evidence that he has ever been diagnosed with diabetic retinopathy." (Tr. 22.) Plaintiff does not argue that the ALJ erred in discounting Dr. Nolan's opinion on this ground. (Pl.'s Opening Br. at 5-6; Pl.'s Reply Br. at 5-6.) Accordingly, the Court finds that Dr. Nolan's reliance on Plaintiff's unreliable reports was a specific and legitimate reason for discounting his opinion. (*See also* Tr. 2894-97, noting that Dr. Nolan based his lifting, carrying, sitting, standing, walking, reaching, handling, fingering, feeling, pushing, and pulling limitations on back and shoulder pain, and that Dr. Nolan also based his postural limitations, in part, on "chronic back pain").

Second, the ALJ discounted Dr. Nolan's opinion because it was inconsistent with "the objective findings of the in-person examination" (Tr. 22), which is a specific and legitimate reason for discounting a physician's opinion. *See Sims v. Berryhill*, 704 F. App'x 703, 704 (9th Cir. 2017) (holding that the ALJ gave specific and legitimate reasons for discounting a physician's opinion and noting that the ALJ found that the physician's opinion was inconsistent with "his objective examination findings"). Plaintiff does not challenge the Commissioner's argument that the ALJ appropriately discounted Dr. Nolan's opinion on the ground that it was inconsistent with his objective findings. (*See* Def.'s Br. at 11; Pl.'s Reply Br. at 5-6; *see also*

Pl.'s Opening Br. at 5-6.) Accordingly, the Court finds no error here. *See also Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (declining to address a finding made by the ALJ because the claimant "failed to argue th[e] issue with any specificity in his briefing").

In light of the foregoing, the Court concludes that the ALJ provided specific and legitimate reasons for discounting Dr. Nolan's opinion and that any error was harmless. *See Bailey v. Colvin*, 659 F. App'x 413, 415 (9th Cir. 2016) (holding that the ALJ provided two specific and legitimate reasons for rejecting a treating physician's opinions, and therefore concluding that "[a]ny error in the ALJ's additional reasons for rejecting [the physician's] opinions was harmless") (citation omitted); *Shoemaker v. Berryhill*, 710 F. App'x 750, 751 (9th Cir. 2018) (holding that the ALJ provided two specific and legitimate reasons for discounting the opinion of an examining psychologist and concluding that ALJ's three erroneous reasons were harmless error); *see also Ann Cox v. Colvin*, No. 15-cv-00190, 2015 WL 8596436, at *14 (N.D. Cal. Dec. 14, 2015) ("[T]he ALJ provided only one specific and legitimate reason for giving little weight to Dr. Mandelbaum's opinion—that his review of the record was limited. Given that the ALJ erred in evaluating Dr. Mandelbaum's opinion in all other regards, this reason alone is insufficient.").

### 3.    Duty to Develop the Record

Plaintiff argues that the ALJ failed to meet her duty to develop the record by not obtaining records detailing a hospitalization that occurred before Dr. Nolan's evaluation, which showed that Plaintiff spent three days in the hospital with nausea and vomiting. (*See* Tr. 2891.) An "ALJ's duty to develop the record is triggered if there is ambiguous evidence or the record is inadequate for proper evaluation of evidence." *Leitner v. Comm'r of Soc. Sec. Admin.*, 361 F. App'x 876, 877 (9th Cir. 2010). Neither is true here. Indeed, Plaintiff does not argue that the

record evidence is ambiguous, nor does Plaintiff explain why the record is inadequate for proper evaluation. (*See* Pl.'s Opening Br. at 5-6.) Furthermore, the Court notes that the ALJ had reviewed records detailing several earlier, but similar, hospitalizations related to nausea and vomiting. Accordingly, the Court concludes that the ALJ did not err by failing to develop the record.

### E.    The ALJ's RFC Determination

Finally, Plaintiff argues that the ALJ failed to account for all of his credible limitations in formulating the RFC. Specifically, Plaintiff argues that, considering his frequent hospitalizations and emergency room visits, the ALJ's RFC determination should have accounted for the fact that Plaintiff would miss work more than once per month, which the VE testified would preclude gainful employment. (*See* Pl.'s Opening Br. at 4.) An ALJ's RFC determination need only account for the claimant's credible limitations. *See De Botton v. Colvin*, 672 F. App'x 749, 751 (9th Cir. 2017) (explaining that an ALJ's RFC and VE hypothetical need only account for the claimant's "credible limitations"). Here, the ALJ provided legally sufficient reasons for discounting Plaintiff's testimony and Dr. Nolan's opinion, which is the primary evidence to support Plaintiff's alleged limitation. (*See, e.g.*, Tr. 2892, noting that "recurring episodes of nausea and vomiting . . . can be problematic in terms of reliability of showing up to work"). Accordingly, the Court concludes that the ALJ accounted for Plaintiff's credible limitations in the RFC determination.

///

///

///

///

///

**CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this 20th day of March, 2019.

STACIE F. BECKERMAN
United States Magistrate Judge